IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

SIERRA CLUB, IOWA CHAPTER,     )
LINDA BIEDERMAN and ELWOOD     )     No. 4:11-cv-00258-SMR-RAW
GARLOCK,     )
    )
    Plaintiffs,     )
    )
    v.     )     **ORDER ON CROSS MOTIONS**
    )     **FOR SUMMARY JUDGMENT**
RAY LaHOOD, as Secretary of the     )
United States Department of     )
Transportation, and LUBIN M.     )
QUINONES, as Division Administrator     )
Of the Federal Highway Administration,     )
    )
    Defendants.     )

# TABLE OF CONTENTS

I.     Factual Background ........................................................................................2

II.     Standard of Review........................................................................................6

    A.  Standard of review under NEPA.......................................................7
    B.  Standard of review under Section 4(f)..............................................8

III.     Inadequacy of Environmental Impact Statements .......................................9

    A.  Whether alternatives to the preferred route were properly considered, and
       whether the purpose and need for the project were adequately justified..........9
    B.  Whether the environmental impacts of the project were adequately
       considered ........................................................................................14
    C.  Whether public comments were adequately addressed ...................18

IV.     Need for a Second Supplemental Environmental Impact Statement ...........20

V.     Inadequacy of the Section 4(f) Evaluation.................................................21

    A.  Whether there were other prudent and feasible alternatives............22
    B.  Whether FHWA properly considered mitigation measures............25
    C.  Whether the project's impact on the whole ecosystem was properly
       considered ........................................................................................27

VI.     Whether FHWA Failed to Use All Practicable Means to Implement NEPA's
    Policies.........................................................................................................28

VII.     Conclusion ...................................................................................................29

This matter comes before the Court on both parties' cross motions for summary judgment.  [ECF Nos. 17, 21].  The plaintiffs, Sierra Club, Linda Biederman, and Elwood Garlock (collectively "Sierra Club") contest the Federal Highway Administration's ("FHWA") approval of the Proposed Extension of Iowa 100, a stretch of road connecting Edgewood Road to U.S. Highway 30, southwest of Cedar Rapids, Iowa.  For the reasons stated below, the Court **GRANTS** the Defendants' Motion for Summary Judgment, and **DENIES** Sierra Club's motion and request for declaratory and injunctive relief.

## I.    FACTUAL BACKGROUND

In June 2008, FHWA approved construction of the Iowa 100 Extension, an approximately eight and one-half mile stretch of road southwest of Cedar Rapids, Iowa.  This project has an extensive history beginning in the 1970's, when various city planning organizations recognized the need for a road connecting Iowa 100 and U.S. 30.  The purpose of this project was to relieve congestion on downtown surface streets.  The Iowa Department of Transportation ("Iowa DOT") began environmental and location studies to identify an appropriate area in which to build in 1978.  This research cumulated in a Draft Environmental Impact Statement ("DEIS") and a Location Study Report, which were both completed in November 1978.  In September 1979, Iowa DOT issued a Final Environmental Impact Statement ("FEIS"), and FHWA granted location approval on October 6, 1980.  Small sections of the road were built, but the majority of the project was stalled because of funding issues and slowed economic growth in the Cedar Rapids area.

Funding issues were resolved in 1999, and Iowa DOT approached FHWA to again approve the project.  Due to the time that had passed between the previous decision, as well as Iowa DOT's desire to modify some aspects of the project's construction, FHWA ordered Iowa

DOT to prepare a Draft Supplemental Environmental Impact Statement ("DSEIS").  The DSEIS was completed and approved by FHWA in July 2001.  The DSEIS evaluated other alternatives not examined in the FEIS, with the goal to avoid impacting the Rock Island State Preserve, a twenty-acre state park.  These additional alternatives included corridors west of 80th Street, three alternatives within the corridor approved in the 1979 FEIS, and five alternatives outside of the approved corridor, four of which avoided the Preserve.  Alternative 1, an option within the approved corridor, was identified as the recommended alternative, as it would not acquire property, nor be visible, from the Preserve.

On September 12, 2001, a public hearing was held to discuss the DSEIS.  Around that time, Iowa DOT received information that state-protected species, the ornate box turtle and Blanding's turtle, occupied habitats along Alternative 1.  Therefore, Iowa DOT conducted surveys to determine whether these turtles were present, as well as additional studies with respect to the Byssus Skipper butterfly, which had been identified in the DSEIS as a protected and threatened species.  Between 2002 and 2004, more alternatives were developed within the preferred corridor (alternatives A through I), with the purpose of minimizing impacts on these species.

In 2002, 100 acres was donated to the Linn County Conservation Board, land which became known as the Rock Island County Preserve.  All alternatives within the preferred corridor, and most outside of it, run through this land.  In 2005, the Rock Island County Preserve, along with the Rock Island State Preserve (collectively, "the Preserve"), was designated a Section 4(f) resource under Section 4(f) of the Department of Transportation Act.[1]  As required by 49 U.S.C. § 303, a Section 4(f) Evaluation was prepared.  Both the Draft and Final Evaluations analyzed the impact of alternatives A through I, along with option F2, which had

---

[1] The Rock Island State Preserve had not previously been designated a Section 4(f) resource.

been developed after the Rock Island County Preserve had been donated.  Alternative F2 is substantially similar to the alternative identified in the DSEIS, but includes the refinements suggested in the Section 4(f) Evaluation, which lessen the impact to Section 4(f) resources. After examining each alternative's impact, the Evaluation determined that alternative F2 caused the least amount of harm to both Section 4(f) and non-Section 4(f) resources.

The Final Supplemental Environmental Impact Statement ("FSEIS"), which incorporated the Final Section 4(f) Evaluation, was approved by FHWA in October 2007.  On June 12, 2008, after examining the DEIS, FEIS, DSEIS, FSEIS, public comments, and field survey results, the Record of Decision approved alternative F2, also known as the preferred alternative, identified in the FSEIS.

The preferred alternative is described as follows: North of Ellis Road, the project follows an abandoned railroad right-of-way to near the west side of the Cedar River, then crosses the Cedar River just north of the Iowa Northern Railroad Bridge.  The road then curves southeast, passing between the east end of the Rock Island County Preserve and the Rock Island State Preserve, again following the former railroad right-of-way before it terminates at Edgewood Road.  The project includes interchanges at U.S. Highway 30, E Avenue, Covington Road, and Edgewood Avenue.

The selected alternative is further described in the Record of Decision as a four-lane divided highway "on new right-of-way with Priority I, or full access control. In the approximately 6 miles between the proposed U.S. Highway 30 interchange and the west side of the Cedar River, the Selected Alternative is a 4-lane, divided highway with a rural typical section."  Admin. R. p. 8468.  A "rural typical" section includes 12-foot travel lanes, 10-foot wide outside shoulders, 6-foot wide inside shoulders, and a 52-foot wide grass median.  The two

and one-half mile stretch between Cedar River and Edgewood Avenue, the project's east terminus, is an urban typical design, which includes the same shoulder widths as the rural typical section, as well as a concrete barrier median and a retaining wall east of the Rock Island Preserve.

Sierra Club now challenges the decision approving construction of this road, stating FHWA violated both the National Environmental Protection Act ("NEPA") and Section 4(f) requirements. Although there are many claims in the Amended Complaint, in the interest of efficiency, the Court has consolidated the allegations that assert substantially the same harm. These claims are:

1. The Environmental Impact Statements were inadequate, in that:
   a. The purpose and need for the project were not adequately justified, and alternatives outside of the preferred route were not seriously considered, including the no-build alternative;
   b. The environmental impacts of the project were not adequately determined and evaluated, including the impact of traffic patterns and volume, the impact on energy resources and climate change, the impact of fragmentation of the ecosystem in the Rock Island Preserve, the impact of noise, and the potential creation of urban sprawl the project encourages;
   c. The FSEIS did not contain public comments, so the FHWA did not have the benefit of evaluating those comments in making its determination;
2. A second Supplemental EIS should have been issued, because six years passed between the issuance of the DSEIS and the FSEIS;
3. The Final Section 4(f) Evaluation was defective in that:
   a. No legitimate efforts were made to avoid impacting land designated as 4(f) resources, as in, there were other prudent and feasible alternatives;
   b. Strategies to avoid or mitigate the environmental impacts were not adequately considered and evaluated;
   c. The impact to the ecosystem as a whole was not considered;
   d. The attempts to mitigate the impacts were inadequate; and
4. FHWA failed to use "all practicable means" in implementing NEPA's policies.

Pl.'s Am. Compl. 8-11.

Both parties have moved for summary judgment on these issues, and agree that there are no material facts in dispute.  The Court now considers Sierra Club's substantive challenges.[2]

## II.    STANDARD OF REVIEW

As a formal matter, Sierra Club's challenges arise under the Administrative Procedure Act ("APA"), which provides for judicial review of agency action.  *Central S.D. Coop. Grazing Dist. v. Sec'y of the USDA*, 266 F.3d 889, 894 (8th Cir. 2001).  Under the APA, a court must uphold the agency action unless it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  *Id.* (citations omitted).  A decision is considered arbitrary and capricious if:

> [T]he agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The Court's review of the agency's action must be searching and careful, but "the ultimate standard of review is a narrow one."  *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1973) (abrogated on other grounds by *Califano v. Sanders*, 430 U.S. 99 (1977)).  In other words, the Court must not substitute its judgment for that of the agency.  *Id.* Additionally, when the decision involves a highly factual inquiry that requires a high level of

---

[2] The Court is aware of 23 U.S.C. § 139(l)(1), which states:

> [A] claim arising under Federal law seeking judicial review of a permit, license, or approval issued by a Federal agency for a highway . . . project shall be barred unless it is filed within 150 days after publication of a notice in the Federal Register announcing that the permit, license, or approval is final . . . .

23 U.S.C. § 139(l)(1) (2006).  However, upon a search of the Federal Register, the Court is not aware of a publication of the Record of Decision, or a notice that the decision approving the project was final.  Therefore, under the plain language of this statute, the time limit does not apply, and the Court may address Sierra Club's substantive claims.

expertise, the Court "must defer to the informed discretion of the responsible federal agencies." *Central S.D. Coop. Grazing Dist.*, 266 F.3d at 894-95 (quoting *Friends of the Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1128 (8th Cir. 1999)).

### A.  Standard of Review Under NEPA

The NEPA requirements themselves are primarily procedural.  "NEPA simply mandates that a federal agency 'take a "hard look" at the environmental consequences' of a major federal action before taking that action." *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 533 (8th Cir. 2003) (quoting *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983)).  As such, the agency must prepare a detailed statement, commonly known as an Environmental Impact Statement ("EIS"), so this information may be made available to the public, and a court may determine whether the agency has considered all the values NEPA seeks to protect. *Id.* (citations omitted); *Minn. Pub. Interest Research Grp. v. Butz*, 541 F.2d 1292, 1299 (8th Cir. 1976).  The EIS should include statements on the proposed action's environmental impact, alternatives to the action, and any unavoidable environmental harm resulting from the action.  42 U.S.C. § 4332(2)(C) (2006).  Upon review of these documents, the Court's role is to determine whether the agency has adequately disclosed the environmental effects of its actions, and whether these actions were arbitrary or capricious. *Mid States Coal. for Progress*, 345 F.3d at 534 (citations omitted).  In other words, the EIS need only be adequate in its form, content, and preparation, as the Court is not required to "fly speck" an EIS for technical or inconsequential deficiencies. *Friends of the Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1128 (8th Cir. 1999).

NEPA seeks to ensure the agency has taken a hard look at the environmental consequences.  Its requirements do not preclude the agency from taking environmentally harmful

actions.  *See Mid States Coal. for Progress*, 345 F.3d at 534 (citations omitted).  Rather, "[i]f the

adverse environmental effects of the proposed action are adequately identified and evaluated, the

agency is not constrained by NEPA from deciding that other values outweigh the environmental

costs . . . . NEPA merely prohibits uninformed−rather than unwise−agency action."  *Robertson*

*v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  As the United States Court of

Appeals for the Eighth Circuit has further noted, "The purpose of NEPA is not to require an

objection free document, but rather to give Congress, the responsible agencies, and the public a

useful decision-making tool."  *Minn. Pub. Interest Research Grp.*, 541 F.2d at 1300; *see also*

*Sierra Club v. Kimbell*, 595 F. Supp. 2d 1021, 1025-27 (D. Minn. 2009) (reviewing standards

under NEPA).

### B.  Standard of Review Under Section 4(f)

FHWA's decision to permit the preferred alternative to run through Section 4(f) resources

is subject to the arbitrary and capricious standard of review.  However, the requirements of

Section 4(f) are more stringent.  *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402,

414-16 (1971) (abrogated on other grounds by *Califano v. Sanders*, 430 U.S. 99 (1977)).  Section

4(f) of the Department of Transportation Act states that the Secretary of the Department of

Transportation:[3]

> [S]hall not approve any program or project . . . which requires the use of any
> publicly owned land from a public park, recreation area, or wildlife and waterfowl
> refuge . . . unless (1) there is no feasible and prudent alternative to the use of such
> land, and (2) such program includes all possible planning to minimize harm to
> such park . . . .

---

[3] The statute and much of the case law dealing with Section 4(f) refer to the Secretary of the Department of
Transportation.  However, as the Secretary's designee, the decisions of FHWA are attributable to the Secretary.  As
such, any language referring to the Secretary also applies to FHWA.  *See Geer v. Fed. Highway Admin.*, 975 F.
Supp. 47, 64 n.21 (D. Mass. 1997).

23 U.S.C. § 138(a) (2006).   The Supreme Court, in interpreting this statute, has noted that its intent was to give paramount importance to protecting parkland, and that "the Secretary cannot approve the destruction of parkland unless he finds that alternative routes present unique problems."   *Citizens to Pres. Overton Park, Inc.*, 401 U.S. at 412-13.   Nonetheless, the Court notes that the standard of review remains narrow, and it is not empowered to substitute its judgment for that of the agency.   *Id.* at 416.

## III.   INADEQUACY OF ENVIRONMENTAL IMPACT STATEMENTS

Substantively, Sierra Club alleges several deficiencies in the Environmental Impact Statements, challenges which implicate NEPA.   The Court will address each claim individually.

### A.   Whether alternatives to the preferred route were properly considered, and whether the purpose and need for the project were adequately justified

Sierra Club asserts that alternatives outside of the preferred route were not seriously considered, including the no-build alternative.   Pl.'s Br. 24.   Specifically, Sierra Club claims that the no-build alternative was summarily rejected because it did not meet the stated purpose and need of the project, and, so, it did not receive the "substantial treatment" required by NEPA.   *Id.* at 24-26.   With respect to the discussion of the no-build alternative, Sierra Club faults the discussion of Transportation Demand Management, stating it was not thoroughly analyzed.   *Id.* It further alleges the Tower Terrace Road and Blairs Ferry Road alternatives should have been considered in more depth, and that "none of these excuses" eliminating these alternatives were "justified."   Pl.'s Am. Compl. 29.   Finally, Sierra Club claims no attempt was made to avoid the Rock Island Preserve, and there were reasonable alternatives outside of the preferred corridor that were not examined.   *Id.* at 32-33.

NEPA requires that the EIS include a detailed discussion of alternatives to the proposed action.   42 U.S.C. § 4332(2)(C)(iii) (2006).   The FEIS must "[r]igorously explore and objectively

evaluate" all reasonable alternatives, but it need only "briefly discuss" the reasons why other alternatives were eliminated.   40 C.F.R. § 1502.14(a).   It must also "[d]evote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits . . . . Include reasonable alternatives not within the jurisdiction of the lead agency . . . . [and] Include the alternative of no action."   *Id.* at (b)-(d). However, "[t]his standard recognizes that a detailed statement of alternatives cannot as a practical matter 'include every alternative device and thought conceivable by the mind of man.'" *City of Bridgeton v. FAA*, 212 F.3d 448, 455 (8th Cir. 2000) (quoting *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc*., 435 U.S. 519, 551 (1978)).   A district court reviews an agency's discussion of alternatives under a "rule of reason."   *Id*. at 455-56 (citations omitted).

Here, FHWA satisfied the requirement that it thoroughly evaluate all reasonable alternatives.  First, six alternatives outside of the preferred corridor, including the Tower Terrace Road and Blairs Ferry Road alternatives, were given thorough consideration in the Draft Section 4(f) Evaluation.   The Evaluation comprehensively discussed their various costs, benefits, and impacts on the environment and the community.   These alternatives were then eliminated because they did not meet the project's purpose and need, they involved too much negative impact on the community, or they were too costly.  Admin. R. p. 7519-26.  Second, the DSEIS explained why non-reasonable alternatives not thoroughly considered in the FEIS were eliminated, as required by 40 C.F.R. § 1502.14(a):

> During preliminary engineering of the recommended alternative, several alternatives in addition to those evaluated above were investigated. These alternatives were not presented to the public, as they were determined to not be viable alternatives either because they did not address the project's purpose and need or they were determined to have significant impacts to natural or socio-economic resources.

*Id*. at 8614.  The DSEIS then discussed the details of those eliminated alternatives, including options outside of the preferred corridor, and why they were not considered and analyzed in greater depth.  *Id*. at 8614-19.  Specifically, those alternatives did not meet the purpose and need of the project, as they were too costly and inefficient.  *Id*. at 4869-70, 4979, 7520, 7522-24, 8616-17.

The no-build alternative, specifically, was evaluated in the FEIS, the Draft and Final Section 4(f) Evaluation, the DSEIS, and the FSEIS, where it was concluded that it would not meet the purpose and need for the project with respect to future traffic demands and safety concerns.  Admin. R. p. 626-30, 7518, 8027, 8596-8600.  In examining this option, alternatives such as Transportation Demand Management and Transportation System Management plans, which would theoretically alleviate traffic concerns, were discussed.  However, after analyzing data from the 2040 Transportation Plan, it was concluded that these options would not satisfy the purpose and need of the project.[4]  *Id*. at 7518.

The Court notes that NEPA's requirements are primarily procedural, and that the Court is not permitted to substitute its judgment for that of the agency.  *Citizens to Pres. Overton Park, Inc.*, 401 U.S. at 416.  As long as the agency has devoted substantial treatment to the discussion of a reasonable alternative, it has satisfied its burden under NEPA.  *See Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377 (1989) (when analysis of relevant documents require a high level of expertise, the court must defer to the judgment of the agency); *Minn. Pub. Interest*

---

[4] The Court further notes there were many other alternatives analyzed in detail.  In the FEIS, the recommended alternative and seven other alternates were discussed.  Admin. R. p. 625-37.  In evaluating these alternatives, the FEIS set forth a detailed description of the routes, as well as the benefits and adverse effects of each alternate.  *Id*. at 626-31.  After the Rock Island Preserve was designated Section 4(f) land, the Draft Section 4(f) Evaluation was prepared.  Both that document and the DSEIS included an analysis of alternatives investigated during the Iowa 100 study that began in December of 1999, the goal of which was to discover alternatives that would not impact, or at least minimize the impact to, Section 4(f) resources.  *Id*. at 7519-26, 8607-19.  Each alternative was thoroughly discussed, including the environmental impact, cost, community impact, how it fit within the purpose and need of the project, and, subsequently, the reasons why it was not selected.  *Id*.  Therefore, with respect to a thorough discussion of alternatives, generally, FHWA satisfied its obligations under NEPA.

*Research Grp.*, 541 F.2d at 1300 (NEPA does not require an objection-free document).  Given the research and analysis of many alternatives conducted by Iowa DOT and FHWA, they have fulfilled their obligations under NEPA with respect to the no-build, the Tower Terrace Road, and the Blairs Ferry Road alternatives, as well as options outside of the preferred corridor. Specifically, FHWA appropriately devoted substantial treatment to each alternative, as required by NEPA and set forth in 40 C.F.R. § 1502.14.  *City of Bridgeton*, 212 F.3d at 455.  Furthermore, the DSEIS explained why other alternatives were not considered reasonable, and, so, the requirement of 40 C.F.R. § 1502.14(a) was also satisfied.  Therefore, FHWA has complied with the procedural requirements of NEPA, and has not abused its discretion in selecting the preferred alternative.

However, the crux of Sierra Club's argument is that FHWA eliminated many alternatives due to an improperly narrow definition of purpose and need.  It states that "FHWA is relying on the alleged purpose and need for the project to eliminate any alternative that would not impact the Rock Island Preserve, and . . . the purpose and need has clearly been manipulated to justify only the preferred alternative . . . ."  Pl.'s Am. Compl. 24. When reviewing the selection of alternatives, using the rule of reason, the Court "must look at whether the agency defined the project's purpose in terms so unreasonably narrow as to make the FEIS 'a foreordained formality.'"  *City of Bridgeton*, 212 F.3d at 458 (quoting *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991) ("Nor may an agency frame its goals in terms so unreasonably broad that an infinite number of alternatives would accomplish those goals and the project would collapse under the weight of the possibilities.")).

The FSEIS defined the purpose of the project in the following manner:

- Reduce congestion and associated problems on the road network in the area adjacent to the proposed Iowa 100 extension.

12

- Provide an efficient connection between the west side of Cedar Rapids (and beyond) to I-380, the city's northeast side, and the City of Marion.
- Provide transportation improvements to accommodate planned growth and associated travel demand increases on the west side of Cedar Rapids.
- Provide an alternate route for through traffic in the event of major traffic stoppages on I-380 or Edgewood Road.

Admin. R. p. 7990.   When discussing the updated project need, the FSEIS stated that:

> [P]roject need can be expressed as a function of four factors: [1] Addressing current and future travel demand; [2] Providing consistency with local planning goals; [3] Increasing safety on the roadway network; [and] [4] Filling a gap in the transportation system and providing system route continuity."[5]

*Id*. at 8008.

In support of the need to alleviate congestion, both the FSEIS and the FEIS discussed the Iowa Department of Transportation Functional Classification Study, which concluded that the project would alleviate congestion at various intersections and streets. *Id*. at 593-94, 8007.   The DSEIS and the FSEIS further relied on the 2030 and 2040 Transportation Plans for the Cedar Rapids Iowa Metropolitan Area, respectively, which documented a great deal of data indicating "the continued growth in vehicle miles of travel in the metropolitan area." *Id*. at 8008-11. Additionally, in the context of examining the effect the Iowa 100 extension would have on congestion levels, the FSEIS discussed a 2004 study by Iowa DOT that evaluated the effect the project would have on the level of service of various surface roads around Cedar Rapids. *Id*. at 8011-14.   When reviewing safety concerns, the FSEIS relied on data documenting crash rates, and observed: "As planned development on the city's west side continues without extending Iowa 100, traffic volumes and congestion on the network would increase, causing a corresponding increase in the potential for crashes." *Id*. at 8017.   Upon review of these

---

[5] Contrary to Sierra Club's assertion, the purpose and need for the project has only undergone a minor change since the FEIS was drafted in 1979, given that roads were constructed between 1979 and 2006. Admin. R. p. 8008, 8576 ("This [Draft] SEIS maintains that original purpose [of the 1979 FEIS].").   The only change was the need that "addressed traffic congestion on First Avenue in the Central Business District that was the focus of the social service demands/economic development need in the 1979 FEIS . . ." was no longer considered pertinent. *Id*. at 8008.

documents, the Court finds they fully support and justify the stated needs of addressing current and future travel demand, providing route continuity and consistency with local planning goals, increasing safety, as well as the purposes to reduce congestion and provide transportation improvements.

Contrary to Sierra Club's allegation, the stated goals do not arbitrarily eliminate alternatives not impacting the Rock Island Preserve. Rather, the purpose and need for the project were thoroughly discussed and documented in the DEIS, FEIS, DSEIS, and FSEIS. Additionally, these goals were supported by various studies. As such, they are not so unreasonably narrow that they render the FEIS a foreordained formality. *City of Bridgeton*, 212 F.3d at 458. Therefore, the Court finds that FHWA did not act in an arbitrary or capricious manner when defining the purpose and need for the project. Nor did FHWA abuse its discretion when examining and choosing the preferred alternative, and eliminating those alternatives that did not comply with the project's purpose and need.

**B.   Whether the environmental impacts of the project were adequately considered**

In its Amended Complaint, Sierra Club alleges that various environmental impacts were not adequately determined and evaluated, including traffic patterns and volume, energy resources and climate change, the fragmentation of the Rock Island Preserve's ecosystem, the impact of noise, and urban sprawl. Pl.'s Am. Compl. 9-10. However, the only arguments substantively addressed in the briefing, and then only in Sierra Club's Reply, were the issues of climate change and urban sprawl. Pl.'s Reply 8-11. With respect to climate change, Sierra Club relies on *Mid States Coalition for Progress v. Surface Transportation Board*, 345 F.3d 520 (8th Cir. 2003), and states that climate change must be a consideration when evaluating the environmental impact of a project. Sierra Club further argues that urban sprawl, or the growth that this project will

encourage, should also be a factor the agency thoroughly considers, as required by 40 C.F.R. § 1502.16(b) and 40 C.F.R. § 1508.8(b), and that this environmental impact was not adequately discussed.

NEPA requires an analysis of "any adverse environmental effects" of major actions. 42 U.S.C. § 4332(2)(C)(ii) (2006). These include reasonably foreseeable direct and indirect effects. 40 C.F.R. § 1508.8. When analyzing these effects, the agency must fully explain its course of inquiry, analysis, and reasoning. *Minn. Pub. Interest Research Grp.*, 541 F.2d at 1299. However, "NEPA does not require that an agency eliminate all adverse [e]ffects that might result from a project." *Mid States Coal. for Progress*, 345 F.3d at 535.

Under NEPA, an agency must discuss the project's impact on air quality as an indirect, adverse environmental effect. 40 C.F.R. § 1508.8(b). Here, in analyzing the project's impact on air quality, the FSEIS concluded that, because there are no nonattainment areas in Cedar Rapids, the project satisfies the Clean Air Act of 1990. As such, no further analysis was required. Admin. R. p. 8022. Iowa DOT also examined the air quality impact on the Rock Island Preserve, and concluded that the project will not have adverse ozone impacts on the Preserve. *Id*. at 8062-66. The project's impact on climate change is not discussed. However, there is no requirement that climate change be analyzed, particularly given the speculative nature of such an effect. *See Mid States Coal. for Progress*, 345 F.3d at 549-50 (the reasonably foreseeable increase in coal consumption and its effect on *air quality*, not climate change, should have been discussed in the EIS). Given the project's compliance with air quality standards, as well as its detailed analysis of ozone impacts, the course of inquiry, analysis, and reasoning is satisfactorily explained, as set forth Sections 3.3.1 and 4.4.8 of the FSEIS. Unlike the agency in *Mid States Coalition*, FHWA has not "completely ignored the effects" of the project's impact on air quality. *Id*. at 550.

Therefore, FHWA has satisfied its obligation under NEPA to address "degradation in air quality . . . ." *Id*. at 549.

With respect to the impact of urban sprawl, NEPA requires that all indirect effects be considered, which "may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate . . . ." 40 C.F.R. § 1508.8(b). The FEIS has satisfied this requirement. Relying on the 2040 Transportation Plan, it concluded that the project is consistent with land use planning goals, and will not unduly affect the planning and zoning of Cedar Rapids already taking place. Admin. R. p. 8067-68. It further analyzed the impact to transportation, utilities, agriculture, and aesthetics, as well as secondary development potential and secondary impacts on existing development. *Id*. at 8068-76, 8175-79 ("Whereas wetlands and farmland can be lost by secondary development associated with a transportation project, it is highly unlikely that public use land would be converted to another use."). Therefore, FHWA adequately considered the project's impact on urban sprawl, in compliance with NEPA. *See generally Sierra Club v. Cavanaugh*, 447 F. Supp. 427, 432-33 (D.S.D. 1978) (potential impact of urban sprawl was not so great that it required preparation of an EIS).

For purposes of the record, the Court will also briefly address the other allegations set forth in the Amended Complaint. Sierra Club claims that "[t]raffic patterns and traffic volume were not adequately determined, accurately described, nor properly considered." Pl.'s Am. Compl. 9. However, the 2040 Transportation Plan on which the FSEIS relied contained a thorough analysis of traffic patterns. *See* Admin. R. p. 7990-91. In fact, this project's entire purpose is based on an analysis of traffic patterns, and FHWA's determination that a new road must be built to accommodate increased traffic. Therefore, this claim is without merit.

Additionally, the FSEIS evaluated the fragmentation of the Rock Island Preserve when it discussed the preferred alternative's impact on the Preserve's wildlife, stating: "The preferred alternative has the potential to cause habitat fragmentation . . . . By locating the preferred alternative adjacent to the Iowa Northern Railroad line where it crosses the Cedar River, the highway makes use of an existing transportation corridor, minimizing habitat fragmentation to the extent practicable." *Id*. at 8066. Although there is no specific discussion of the fragmentation of the ecosystem as a whole, in analyzing the project's effects on floodplains, water resources, wetlands, plant communities, wildlife resources, and endangered species, FHWA satisfied its obligation under NEPA to examine potentially damaging effects to protected resources. *See Sierra Club v. Kimball*, 623 F.3d 549, 555-62 (8th Cir. 2010) (discussion of impact to individual resources, rather than a discussion of the ecosystem as a whole, satisfies NEPA).

Sierra Club further claims that "[i]mpacts from noise were not adequately and properly determined and evaluated." Pl.'s Am. Compl. 11. However, the FSEIS contains many discussions on the impact of noise, as well as mitigation measures that abate its impact on both the environment and residential areas. Admin. R. p. 8028-29, 8062-72. As such, FHWA fully explained its course of inquiry, analysis, and reasoning, thereby satisfying the requirements of NEPA. *Minn. Pub. Interest Research Grp.*, 541 F.2d at 1299.

Upon review of the record, the Court concludes FHWA complied with the procedural requirements of NEPA when considering the project's adverse environmental impacts. Therefore, it did not act in an arbitrary or capricious manner when approving the recommended alternative, and has acted in accordance with law.

### C.  Whether public comments were adequately addressed

In its Amended Complaint, Sierra Club states the FSEIS did not contain public comments.  Pl.'s Am. Compl. 9.  As such, it claims FHWA did not have the benefit of evaluating the comments when issuing the Record of Decision.  *Id*.  Additionally, Sierra Club claims that appropriate public forums were not held, which renders the NEPA process inadequate.  Relying on *Highway J Citizens Group, U.A. v. United States Department of Transportation*, 656 F. Supp. 2d 868 (E.D. Wis. 2009), which held that an open house type of event does not satisfy NEPA's public hearing requirement, Sierra Club claims that Iowa DOT held open houses instead of public hearings, and thus violated NEPA.  Pl.'s Br. 34-35.

The Council on Environmental Quality imposes upon the agency the duty to assess, consider, and respond to all comments "in the final statement."   40 C.F.R. § 1503.4(a); *Mid States Coal. for Progress*, 345 F.3d at 537.  Sierra Club does not claim that FHWA or Iowa DOT violated NEPA by not responding to public comments.  Rather, it alleges the FSEIS did not contain comments from the public, so FHWA did not have the benefit of those comments when issuing the Record of Decision.  Though Sierra Club does not cite any statutory authority for its claim, the Court construes Sierra Club's allegation to state that this action is in violation of 40 C.F.R. § 1502.9, which states that:

> Final environmental impact statements shall respond to comments as required in part 1503 of this chapter.  The agency shall discuss at appropriate points in the final statement any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised.

40 C.F.R. § 1502.9(b).

NEPA requires that the final EIS include public comments.  Sierra Club's allegation that the FSEIS did not contain these comments is inaccurate.  The Final Section 4(f) Evaluation,

which is incorporated into the FSEIS, contains a record of public comments and the agency's response in section 4F.10.2.   Admin. R. p. 8158-60.   Although the FSEIS does not reference every detailed comment contained elsewhere in the record, section 1502.9's requirement is not so specific that it mandates the FEIS address every comment raised in response to the project. Instead, it requires the agency to revisit responsible opposing views, and address any comments to which the draft EIS did not adequately respond.   40 C.F.R. § 1502.9(b).   Upon review of the FSEIS, FHWA has satisfied this obligation.

Moreover, despite Sierra Club's claim that FHWA did not have the benefit of evaluating comments, FHWA clearly had both access, and the ability, to respond to all comments, as evidenced by its responses to public comments in the Record of Decision.   Admin. R. p. 8478-91.   Additionally, it had the benefit of the entire administrative record when issuing its decision, including the hundreds of pages of comments and responses contained therein.    Therefore, the Court concludes FHWA satisfied its obligation under NEPA with respect to considering and addressing comments from the public.   *See Olmsted Citizens for a Better Cmty. v. United States*, 606 F. Supp. 964, 979 (D. Minn. 1985) (comments contained in the EIS and reviewed prior to the issuance of the Record of Decision satisfied NEPA).

Additionally, Sierra Club does not cite, and the Court is not aware of, any binding authority that requires a public hearing instead of an "open house" forum.   Rather, NEPA requires that the public have access to information concerning the project and its environmental effects.   *See generally Sierra Club. v. U.S. Forest Serv.*, 46 F.3d 835, 837 (8th Cir. 1995); *Lakes Region Legal Def. Fund, Inc. v. Slater*, 986 F. Supp. 1169, 1199 (N.D. Iowa 1997).   Here, the record reflects many public hearings were held during the planning stages of the project, in addition to the comments that were solicited.   Therefore, FHWA has complied with NEPA, and

acted in accordance with law.  As such, Sierra Club's claims with respect to public hearings and comments are without merit.

## IV.   NEED FOR A SECOND SUPPLEMENTAL ENVIRONMENTAL IMPACT STATEMENT

Though absent in its original Brief in Support of the Motion for Summary Judgment, in its Amended Complaint and Reply, Sierra Club argues that a second supplemental EIS should have been composed.  Pl.'s Am. Compl. 10; Pl.'s Reply 6.  Sierra Club asserts that, given the six years that passed between the issuance of the DSEIS and the FSEIS, and the discovery of the habitats of the ornate box turtle and Blanding's turtle, the circumstances relating to the project and the information relevant to the environmental impacts have changed drastically.  Pl.'s Reply 6-7.  Therefore, a second Supplemental EIS should be prepared.  *Id.*

NEPA requires an agency to prepare supplements to an FEIS if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1)(ii).  However, "an agency need not supplement an EIS every time new information comes to light after the EIS is finalized."  *Marsh*, 490 U.S. at 373.  Therefore, a court must review the denial of a request for a supplemental EIS under the "rule of reason," and give deference to an agency as long as the decision was not arbitrary or capricious.  *Mid States Coal. for Progress*, 345 F.3d at 544.

Here, there have been no significant new circumstances warranting a second supplemental EIS.  Specifically, once the turtles' habitats were discovered, reports with regard to the project's effect on these habitats were prepared.  The reports also included mitigation measures, which were then incorporated into the Draft Section 4(f) Evaluation, as well as the FSEIS.  *See* Admin. R. p. 8111-12, 8126-27.  FHWA was not required to prepare another supplemental EIS simply because new information came to light.  *Marsh*, 490 U.S. at 373.

Furthermore, given the extensive nature and timeline involved, and the thousands of pages of reports already prepared in anticipation of this project, including the DEIS, FEIS, DSEIS, FSEIS, and Draft and Final 4(f) Evaluations, the Court does not find there were significant new circumstances or information requiring the preparation of a second SEIS.  Therefore, FHWA's decision to not draft a second supplemental EIS was not arbitrary or capricious.

## V.        INADEQUANCY OF THE SECTION 4(f) EVALUATION

The Supreme Court in *Citizens to Preserve Overton Park* set forth three factors a court must consider when reviewing agency action under Section 4(f).  First, a court must determine whether the Secretary acted within the scope of his authority, which is construed as inquiring whether the Secretary reasonably believed there were no prudent or feasible alternatives to the chosen project.  *Citizens to Pres. Overton Park, Inc.*, 401 U.S. at 416.  Second, a court must determine whether the decision was arbitrary or capricious, as in, whether the Secretary based the decision on consideration of the relevant factors or if there was a clear error in judgment.  *Id*. Finally, as under NEPA, the Secretary must have complied with all of the statute's procedural requirements.  *Id.* at 417; *see also Ringsred v. Dole*, 828 F.2d 1300, 1302 (8th Cir. 1987); *Geer v. Fed. Highway Admin.*, 975 F. Supp. 47, 64 (D. Mass. 1997).

The party challenging the adequacy of the Section 4(f) determination bears the burden "to show by a preponderance of the evidence that the Secretary acted improperly in approving the use of protected property."  *Ringsred*, 828 F.2d at 1302.  It is also the challenging party's responsibility to propose cognizable alternatives that would not use Section 4(f) resources.  *See Comtys., Inc. v. Busey*, 956 F.2d 619, 625 (6th Cir. 1992) ("[A]n alternative route that causes substantially equal damage to § 4(f) property is not a cognizable alternative within the meaning of § 4(f).");  *Lakes Region Legal Def. Fund, Inc.*, 986 F. Supp. at 1199-1200.  Here, Sierra Club

appears to contest most aspects of FHWA's determination to use Section 4(f) resources.  The Court will address each claim individually.

   A.   *Whether there were other prudent and feasible alternatives*

   Sierra Club claims that no legitimate effort was made to avoid impacting Section 4(f) property.  Pl.'s Am. Compl. 10.  The Court construes this claim to allege that there were other prudent, feasible alternatives to the preferred route.  The alternatives Sierra Club supports are the Blairs Ferry Road, Tower Terrace Road, and County Home Road alternatives.

   An alternative is feasible and prudent if it "avoids using Section 4(f) property and does not cause other severe problems of a magnitude that substantially outweighs the importance of protecting the Section 4(f) property."  23 C.F.R. § 774.17.  The statute further defines "feasible" and "prudent," stating:

> (2) An alternative is not feasible if it cannot be built as a matter of sound engineering judgment.
> (3) An alternative is not prudent if:
>    (i) It compromises the project to a degree that it is unreasonable to Proceed with the project in light of its stated purpose and need;
>    (ii)  It results in unacceptable safety or operational problems;
>    (iii) After reasonable mitigation, it still causes:
>       (A) Severe social, economic, or environmental impacts;
>       (B) Severe disruption to established communities;
>       (C) Severe disproportionate impacts to minority or low income populations; or
>       (D) Severe impacts to environmental resources protected under other Federal statutes;
>    (iv) It results in additional construction, maintenance, or operational costs of an extraordinary magnitude;
>    (v) It causes other unique problems or unusual factors; or
>    (vi) It involves multiple factors in paragraphs (3)(i) through (3)(v) of this definition, that while individually minor, cumulatively cause unique problems or impacts of extraordinary magnitude.

*Id*. at (2)-(3).

With regard to the Blairs Ferry Road alternative, Sierra Club asserts that, contrary to the Section 4(f) Evaluation's conclusion, this alternative runs north of the Preserve, and does not in fact impact any Section 4(f) resource. It further criticizes FHWA's other justifications for eliminating this alternative, stating they are not supported by any evidence. However, upon review of the record, FHWA's elimination of the Blairs Ferry alternative was not arbitrary or capricious. In comparing Figures 4F-2 and 4F-3, the Court concurs with FHWA's conclusion that this alternative does not avoid Section 4(f) resources. Thus, it is not an avoidance alternative. *See Ringsred*, 828 F.2d at 1302 ("An alternative route that also impacts upon parks and historic sites is not an alternative to the use of such property within the meaning of section 4(f).") (quoting *Druid Hills Civic Ass'n, Inc. v. Fed. Highway Admin.*, 772 F.2d 700, 715 (11th Cir. 1985)). However, even if this option were to avoid Section 4(f) land, the increased cost of $9.5 million results "in additional construction, maintenance, [and] operational costs of an extraordinary magnitude," which renders this an imprudent alternative. 23 C.F.R. § 774.17(3)(iv).

Sierra Club next argues that the Tower Terrace Road, a true avoidance alternative, should not have been eliminated simply because it did not fit the purpose and need of the project.[6] In rejecting this alternative, FHWA concluded that it did not:

> [S]erve the transportation improvement needs in the developed area between 42nd Street and Blairs Ferry Road along Collins Road west of I-380. The alternative

---

[6] Sierra Club also argues that the reasons set forth in the DSEIS for rejecting this alternative were not contained in the FSEIS or the Final Section 4(f) Evaluation, and that "FHWA obviously could not continue to assert these allegations with a straight face." Pl.'s Br. 44. Sierra Club then goes on to criticize each stated reason for rejecting this alternative. Sierra Club further cites many comments submitted to FHWA and Iowa DOT, claiming neither entity properly responded to the comments. As to Sierra Club's first contention, the Court finds that it is without merit. FHWA had the benefit of the entire administrative record when making its decision, and, for the reasons stated in the body of this opinion, the inability to comply with the project's purpose and need is alone an adequate basis for rejecting the Tower Terrace Road alternative. With regard to Sierra Club's second argument, the Court addressed this concern in the previous section analyzing FHWA's responsibility to respond to public comments. Additionally, the Court notes that FHWA responded to all comments referenced in Sierra Club's brief, both in the FSEIS and the Record of Decision.

also does not serve or provide a connection to the highly developed Collins Road/Iowa 100 corridor in Cedar Rapids and Marion between I-380 and US Highway 151/Highway 13. Rather, the Tower Terrace Road Alternative, which lacks a connection [to] I-380, serves an undeveloped corridor along the border of Hiawatha and Robins that terminates 2 miles east of I-380.

Admin. R. p. 8143.  After a lengthy discussion of this alternative, which relied on the 2040

Transportation Plan, the Evaluation further noted that:

[T]he proposed Iowa 100 extension and proposed east extension of Tower Terrace Road serve different functions and that both are needed to properly serve the metropolitan area. To assume that the Tower Terrance Road Alternative could replace the proposed Iowa 100 improvements would be contrary to sound local planning efforts.

*Id*. at 8144.  The Court agrees with this analysis and notes, based on Figure 4F-2, that this

alternative is much longer than the recommended alternative, and serves a completely different

area.  Thus, this option "compromises the project to a degree that it is unreasonable to proceed

with the project in light of its stated purpose and need."  23 C.F.R. § 774.17(3)(i).  As such,

FHWA did not act in an arbitrary or capricious manner when eliminating this alternative.

Finally, Sierra Clubs states that the County Home Road alternative should have been

given more consideration, again relying on its previous argument that the project's purpose and

need were inadequate.  Pl.'s Br. 28-29.  However, that argument has been previously considered

and dismissed.  Furthermore, the County Home Road option is even longer and more circuitous

than the Tower Terrace Road alternative.  *See* Figure 4F-2, Admin. R. p. 8162.  Thus, FHWA did

not abuse its discretion when rejecting this alternative because it could not "serve the

transportation improvement needs" of the project.  *Id*. at 8144; *see Ringsred*, 828 F.2d at 1304

("While the Secretary is obliged to consider all reasonable alternatives, an alternative that does

not effectuate the project's purposes is, by definition, unreasonable . . . ."); *Lakes Region Legal

Def. Fund, Inc.*, 986 F. Supp. at 1201 (when rejecting an alternative that did not comply with the

project's purpose and need, "FHWA is not required to make a further showing of 'unique problems' or 'truly unusual factors' associated with [another] alternative.") (internal citations omitted).

After a "thorough, probing, in-depth review," *Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 415, the Court concludes Sierra Club has not met its burden to show there were other prudent, feasible alternatives that would not impact Section 4(f) resources.   Therefore, FHWA did not act improperly when approving the use of Section 4(f) land, as it reasonably concluded there were no prudent or feasible alternatives to the preferred route.   Thus, its choice of the preferred alternative was not an abuse of discretion.   *See Ringsred*, 828 F.2d at 1302.

### B.   Whether FHWA properly considered mitigation measures

In further disputing FHWA's determination to use 4(f) resources, Sierra Club's Amended Complaint asserts that both the attempts to mitigate the environmental impact as well as the consideration and evaluation of the impact were insufficient.   Pl.'s Am. Compl. 10-11.   In its Reply brief, Sierra Club alleges the FEIS is deficient because it does not adequately discuss the requisite mitigation measures, specifically with respect to the Byssus Skipper butterfly, the Northern panic grass, and the effected woodlands.   Pl.'s Reply 11-13.

Section 4(f)(2) requires a project to include "all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use." 49 U.S.C. § 303(c)(2) (2006).   This section further mandates that FHWA choose the alternative with the least environmental impact.   *Id*. at (d)(1), (3) ("[T]he Secretary may make a finding of de minimis impact only if . . . the Secretary has determined . . . that the transportation program or project will not adversely affect the activities, features, and attributes of the park, recreation area, or wildlife or waterfowl refuge eligible for protection under this section.").   Although Section

25

4(f) clearly imposes a duty to mitigate environmental harm, the Court is not required to "fly speck" to ensure each and every factor or standard was considered.  *Friends of the Boundary Waters Wilderness*, 164 F.3d at 1128.

In the Final Section 4(f) Evaluation, FHWA outlined the selection process it employed when choosing the preferred alternative.  To comply with Section 4(f), FHWA noted that the selected alternative should be the option that "results in the least overall harm to the 4(f) resources . . . . [where] the net harm analysis 'is governed by all the possible mitigation that could be done to minimize harm to the 4(f) resource.'"  Admin. R. p. 8145-46 (quoting the FHWA policy paper).  The Least Harm Analysis section then evaluated each alternative's impact, including its impact on non-Section 4(f) resources, such as the Byssus Skipper habitat, the Northern panic grass, wetlands, and sand prairie.  *Id*. at 8146-51.  Finally, the Evaluation examined various measures to minimize and mitigate harm.  These efforts include several engineering and design options that reduce the road's footprint, specific alignment of the road to avoid the most delicate areas of the Section 4(f) land, construction of wildlife crossings, and Iowa DOT's purchase of at least twenty acres to offset the impact, which it would then donate to the Linn County Conservation Board.  *Id*. at 8151-53.  Additionally, the FSEIS considered measures to minimize impact to traffic, agriculture, property acquisition, woodlands and plant communities, wildlife, water quality, wetlands, borrow sites, and special waste.  *Id*. at 8109-14.

Sierra Club is correct in its assertion that FHWA did not discuss mitigation measures with respect to the Byssus Skipper butterfly and the Northern panic grass, but FHWA is not required to do so under Section 4(f)(2).  Rather, it must include in its discussion plans to minimize and mitigate impacts on Section 4(f) land, which these resources are not, and choose the option with de minimis impact.  49 U.S.C. § 303 (2006).  Here, the Final Section 4(f)

Evaluation includes consideration and planning of many positive efforts at minimization and mitigation.  Furthermore, upon review of the record, the Court is satisfied that FHWA properly considered and then chose the alternative with the least impact to 4(f) resources, as well as planned for all possible minimization and mitigation options.  *See Geer*, 975 F. Supp. at 77 (broad and generalized statements of mitigation measures satisfied Section 4(f)(2) requirements).  Therefore, the Court concludes FHWA's decision was not arbitrary or capricious.  *See Citizens to Pres. Overton Park, Inc.*, 401 U.S. at 416.

### C.  Whether the project's impact on the whole ecosystem was properly considered

Finally, in its Amended Complaint under the Section 4(f) claim, Sierra Club states that the impact of the ecosystem as a whole was not properly considered.  Pl.'s Am. Compl. 10-11.  Despite its placement in the Section 4(f) category, this is most logically construed as a NEPA claim, given that it is a consideration which must be addressed when drafting the EIS, or, in other words, a procedural requirement under NEPA.[7]  Furthermore, this claim was substantively addressed when the Court considered Sierra Club's allegation concerning the fragmentation of the Rock Island Preserve's ecosystem.  In the above section, the Court found that FHWA did not

---

[7] Theoretically, the Court could construe this claim as an argument that the procedural requirements of Section 4(f) were not met, given its substantial similarity to a NEPA claim.  In the interest of satisfying all possible claims, the Court will address this argument.  The Policy Paper of Section 4(f) requires that the following be completely documented:

1. The applicability or non-applicability of Section 4(f);
2. The coordination efforts with the official(s) having jurisdiction over or administering the land;
3. The location and design alternatives that would avoid or minimize the harm to the Section 4(f) land; and
4. All measures that minimize harm.

FWHA SECTION 4(F) POLICY PAPER § 3 (2012), *available at* http://environment.fhwa.dot.gov/4f/4fpolicy.asp.  As discussed previously, the Section 4(f) Evaluation, in combination with the four EIS's, were exhaustive in documenting the environmental effects of the project.  Moreover, upon review of the Draft Section 4(f) Evaluation, the Final Section 4(f) Evaluation, the DEIS, the FEIS, the DSEIS and the FSEIS, it is clear the agency complied with all procedural requirements of this statute, including the applicability of Section 4(f), coordination with Iowa and federal officials, and documenting the minimization of harm.  Therefore, as a formal matter, the Court finds that the procedural requirements of Section 4(f) were met.

act in an arbitrary or capricious manner when addressing this concern.   As such, FHWA's

actions do not amount to an abuse of discretion within the context of a Section 4(f) claim either.

## VI.   WHETHER FHWA FAILED TO USE ALL PRACTICABLE MEANS TO IMPLEMENT NEPA'S POLICES

Sierra Club maintains that FHWA did not comply with NEPA because it did not use all

practicable means to implement NEPA's policies, as required by section 101(b) of NEPA.  Pl.'s

Am. Compl. 9.   42 U.S.C. § 4331(b) (2006).   The intent of NEPA is embodied in the statute

itself:

> The Congress . . . declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

*Id*. at (a).   Courts have construed this stated policy to require agencies to consider significant

environmental impacts in a "detailed statement," make available relevant information, and open

up the decision-making process to public scrutiny, so as to comply with the environmental goals

set forth in NEPA.   *See generally Minn. Pub. Interest Research Grp.*, 541 F.2d at 1299; *Envtl.*

*Def. Fund, Inc. v. Froehlke*, 473 F.2d 346, 351 (8th Cir. 1972); *Envtl. Def. Fund, Inc. v. Corps of*

*Eng'rs of U.S. Army*, 470 F.2d 289, 298 (8th Cir. 1972).

The Court has previously addressed the substantive issues this particular claim

implicates, such as FHWA's examination of the project's environmental consequences.   Given

the many environmental impact statements published with respect to this project, FHWA's

compliance with NEPA's publicity requirements, as well as its thorough examination of the

project's environmental consequences in each EIS, it is clear FHWA has used all practicable

means to implement NEPA's policies.   Therefore, this claim is without merit.

## VII.   CONCLUSION

For the reasons stated above, the Court finds FHWA did not act in an arbitrary or capricious manner or abuse its discretion, and that it acted in accordance with law when selecting the proposed alternative for the Iowa 100 extension.   Therefore, the Court **GRANTS** Defendants' Motion for Summary Judgment and **DENIES** Sierra Club's motion and request for declaratory and injunctive relief.

IT IS SO ORDERED.

Dated this 10th day of June, 2013.

STEPHANIE M. ROSE
U.S. DISTRICT COURT JUDGE